UNITED STATES v. YANKEE FUEL CO.

(District Court, D. New Mexico. April 13, 1912.)

No. 18.

*(Syllabus by the Court.)*

1. PUBLIC LANDS (§ 111*)—PATENTS—COAL LAND—ENTRIES—"PRE-EMPTION LAWS."

The proviso to section 7 of the Act of March 3, 1891, c. 561, 26 Stat. 1098 (U. S. Comp. St. 1901, p. 1521), giving the right to patent where no contest or protest has been filed within two years after receiver's receipt "upon the final entry of any tract of land under the homestead, timber culture, desert land, or pre-emption laws," does not include coal land entries.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 310; Dec. Dig. § 111.*]

*(Additional Syllabus by Editorial Staff.)*

2. PUBLIC LANDS (§ 111*)—"PRE-EMPTION."

The word "pre-emption" has a varied meaning. At common law it expressed the king's right to buy provisions and other necessaries for his household in preference to others. In international law, it expresses the right of a nation to detain goods of a stranger in transit so as to afford its subjects a preference. Webster gives, among other definitions, the right of purchase before another, but the word "pre-emption" in Act March 3, 1891, c. 561, § 7, 26 Stat. 1098 (U. S. Comp. St. 1901, p. 1521), relating to homestead entries, has another well-defined technical meaning, familiar to all.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 310; Dec. Dig. § 111.*

For other definitions, see Words and Phrases, vol. 6, pp. 5496, 5497.]

In Equity. Bill by the United States against the Yankee Fuel Company. Motion for temporary injunction granted.

George W. Wickersham, Atty. Gen., and S. B. Davis, Jr., U. S. Dist. Atty., of Las Vegas, N. M., for the United States.

Kellogg & Rose, of New York City, Northcutt & McHendrie, of Trinidad, Colo., and John Morrow, of Raton, N. M., for defendant.

POPE, District Judge. This suit is brought by the United States to restrain the mining of coal upon certain premises in Colfax county. The allegations are such as, if true, to demonstrate that the original entry woman, Smith, filed on the land in 1904 for the benefit of one Wilson, and under circumstances such as made the proceedings a fraud upon the government. It is further alleged that Wilson, pursuant to this corrupt understanding, in 1905 received a transfer of the entry from Mrs. Smith. Final receipt issued March 4, 1905, but no patent has issued. The defendant company acquired the entry in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

1908 it is alleged with notice of the fraud by Smith and Wilson. In January, 1908, the government served notice on defendant to show cause why the entry should not be canceled because of the fraud in its inception, and this proceeding to cancel is still pending before the Land Department. With a view of preventing the defendant from continuing to mine coal on the premises, it is prayed that a temporary injunction issue pending the final determination of the land office controversy, and that a perpetual injunction issue in the event that the entry be finally canceled. The sworn answer of defendant puts in issue the allegations as to fraud by Smith and Wilson, and asserts that, if any such existed, defendant bought without notice in good faith and for value. It is also claimed for defendant that the action does not lie because the question as to the validity of the entry was not raised by the government within two years from the date of the final certificate, and because, by section 7 of the Act of March 3, 1891, c. 561, 26 Stat. 1098 (U. S. Comp. St. 1901, p. 1521), the right to patent became absolute after such two years.

It is not contested by defendant that under Erhardt v. Boaro, 113 U. S. 537, 5 Sup. Ct. 560, 28 L. Ed. 1113, a proceeding of this character will ordinarily lie by the government to restrain waste pending the determination of ownership. Neither is it seriously contended that a lack of notice by the defendant of the initial fraud alleged would of itself constitute a defense in a case such as this where patent has not issued. Hawley v. Diller, 178 U. S. 537, 20 Sup. Ct. 986, 44 L. Ed. 1157, would seem to conclude the defendant upon this point, and there is nothing in U. S. v. Detroit Company, 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499, detracting from this conclusion. [1] The principal reliance of defendant is upon the two-year limitation under the act of March 3, 1891. That act, which is entitled "To repeal timber culture laws, and for other purposes," contains the following proviso in its section 7:

"Provided, that after the lapse of two years from the date of the issuance of the receiver's receipt upon the final entry of any tract of land under the homestead, timber culture, desert land, or pre-emption laws, or under this act, and when there shall be no pending contest or protest against the validity of such entry, the entryman shall be entitled to a patent conveying the land by him entered, and the same shall be issued to him; but this proviso shall not be construed to require the delay of two years from the date of said entry before the issuing of a patent therefor."

The controversy is as to whether the words "under the pre-emption laws" as just used were intended by Congress to include coal land entries. It is urged by defendant, agreeably to the derivation of the word "pre-emption," that it means, broadly, any process whereby land is acquired from the government under circumstances such that the entryman has a prior right of purchase, and it is said that coal land entries in certain aspects have this quality. On the other hand, the government contends that the term "pre-emption laws" has a well-defined technical meaning, familiar to all, as including simply the act of September 4, 1841, and acts amendatory thereof, as contained in chapter 4 of title 32 (sections 2257–2288) of the Revised Statutes (U. S. Comp. St. 1901, pp. 1379–1386). In determining which of

these positions is correct, little aid is derived from the decisions of the Land Department, for these are not harmonious. While certain early expressions from the officers charged with administering the public lands favor the view urged by defendant (In re James G. Harris et al., 28 Land Dec. Dept. Int. 90; Instructions of June 3, 1904, 33 Land Dec. Dept. Int. 10) the recent expressions are to the contrary. In re Thomas A. Cummings, 39 Land Dec. Dept. Int. 93; Alaska Coal Lands, 39 Land Dec. Dept. Int. 327, 332. With the exception of a case from the District of Columbia, to be presently considered, the question does not appear ever to have been expressly determined by the courts.

[2] It is undoubtedly true, as defendant contends, that the word "pre-emption" has a varied meaning. At common law it expressed the king's right to buy provisions and other necessaries for the use of his household in preference to others. In international law it expresses the right of a nation to detain goods of a stranger in transit so as to afford its subjects a preference of purchase. Webster's New International Dictionary, 1911, gives, among other definitions, "the right of purchase before another." Viewed in this last light, the expression is probably broad enough to include coal entries, at least those under the second section of the Coal Land Act of March 3, 1873, Rev. St. § 2348 et seq. (U. S. Comp. St. 1901, p. 1440). But did Congress use it in that sense? For many years prior to the Act of 1891 the term "pre-emption laws" had had a well-known special meaning. This is pointed out in Atherton v. Fowler, 96 U. S. 513, 24 L. Ed. 732, where the court, speaking in 1877, sets forth the "violation, fraud and oppression" which attended the sales of public lands prior to the Act of 1841. The court says:

"To remedy this state of things the pre-emption system was established. This, at first, was only applicable to lands which had been surveyed. But gradually this was changed, until, in 1862, pre-emptions were allowed, under proper restrictions, on unsurveyed lands as well as those surveyed. Act June 2, 1862 [c. 95] 12 Stat. 418. It may, therefore, be said that at the time the transactions occurred of which we are speaking there were three modes of securing title to public lands: (1) By purchase at the public land sales ordered by the President. (2) By private entry; that is, by going to the land officer and paying at the rate of $1.25 or $2.50 per acre for any land subject to private entry or sale at those rates respectively. (3) By pre-emption. Both the former modes contemplated the immediate payment of the money, and the right of the party to the land was fixed when this was done. He had then a vested interest, which became a perfect legal title when he received his patent. This was usually after such delay as was necessary to ascertain if there were any conflicting claims or rights to the land. But the pre-emption of land did not require or admit of payment at the time the right of pre-emption was exercised. The land might not have been surveyed, and then it could not be identified or described so as to cause a patent to issue on it. The law also intended to give the settler time to build a house, break up the ground, and make a settlement first and payment afterwards. During this preliminary period he had no vested right to the land; but, as we have elsewhere decided, he did thus acquire the right of preference in the purchase. That is to say, if he made the necessary settlement and improvement, and the necessary declaration in writing, no other person could buy the land until the period elapsed which the law gave him to pay the purchase-money. Frisbie v. Whitney, 9 Wall. 187 [19 L. Ed. 668]; Hutchings v. Low, 15 Wall. 77 [21 L. Ed. 82]. Among the things which the law required of a pre-emptor, and the principal things required of him to secure his right, were (1) to make

a settlement on the land in person; (2) to inhabit and improve the same; (3) to erect a dwelling house thereon. Section 2259, Rev. Stat."

The foregoing clearly shows that when Congress passed the act of March 3, 1891, the term "pre-emption laws" had a well-defined technical significance. It is a familiar rule of statutory construction that terms having a technical meaning are presumed to be used by the Legislature in that sense unless it clearly appears from the statute itself that it was the intention to use them in a more popular sense. As was said in Hawley v. Diller, supra, in dealing with the definition of "bona fide purchaser":

"This was the well-defined meaning of the term long before the enactment of the statute under consideration. Unless it is apparent that Congress intended it to have a different meaning it is to be presumed to have been used in its technical sense."

We see no indication from the statute of 1891 of any intention that the term "pre-emption" should be construed in a popular rather than in its technical sense. Indeed, rather the contrary. The same word is used at least three other times in the same statute (sections 3, 4 and 7 [U. S. Comp. St. 1901, pp. 1385, 1381, 1521]), and in each instance under circumstances which show its use to be special. In section 4, for example, there is an express repeal of certain specified sections of the Revised Statutes and "all other laws allowing pre-emption of the public lands of the United States." Certainly this is as broad as the language in section 7, upon which defendant relies. And yet to give it the construction contended for would mean that the very coal land laws upon which defendant's entry rests were repealed by the act which it invokes as quieting such entry. A further very relevant consideration is pointed out in United States ex rel. Gribble v. Ballinger, 33 App. D. C. 211, which dealt with the question of whether an entry under the Timber and Stone Act was within the proviso of section 7. In that decision it is said:

"In a specific sense and by common usage pre-emption laws meant the early laws relating to the disposition of the public lands, enacted years before the timber culture, desert land, and timber and stone acts. If the word was intended to be used in the generic sense in the proviso, there was no occasion whatever for preceding it with the particular recital of entries under the homestead, timber culture, and desert land laws. As entries under those laws constitute pre-emptions in the broad sense of the word, their recital would be of no effect unless the word be given its limited signification. And, as all the words of a statute are to be given effect, if reasonable, in its construction, the special recital would seem to indicate that Congress intended that pre-emption should have this restricted meaning."

It is sought to distinguish the Gribble Case upon the ground that entries under the timber and stone act there dealt with have no pre-emption features, whereas coal land entries have. As to the entries at least under section 1 of the coal entry act of 1873 (Rev. St. § 2347 [U. S. Comp. St. 1901, p. 1440]), however, the transaction is a pure purchase with no elements of pre-emption. But, however this may be, we deem it clear that the proviso invoked does not cover defendant's situation, and that a temporary injunction must accordingly issue as prayed.